IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES F. HYMES, | ) | CASE NO. 5:08 cv 203 |
| | ) | |
| Plaintiff, | ) | JUDGE ADAMS |
| | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **REPORT AND RECOMMENDATION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff James Hymes' application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

## I.  PROCEDURAL HISTORY

On April 7, 2004, Plaintiff filed an application for Disability Insurance benefits, alleging a disability onset date of May 3, 2003 due to limitations related to lumbar stenosis and

degenerative disk disease. On May 18, 2007, Administrative Law Judge Paul Armstrong (the "ALJ") determined Plaintiff had the residual functional capacity ("RFC") to perform his past relevant work as a lead man at a paper mill, as well as a number of other jobs including information clerk, eye glass assembler and surveillance system monitor and, therefore, was not disabled (Tr. 12, 21, 22 ). On appeal, Plaintiff claims that the ALJ: (1) erred in his analysis of Plaintiff's credibility; (2) failed to consider the side effects of Plaintiff's medications; (3) failed to give proper weight to the opinion of Plaintiff's treating physician; (4) erred because the jobs listed in the ALJ's Step 5 finding do not exist in significant numbers in the national economy; and (5) erred by failing to provide a specific limitation for his carpal tunnel syndrome in his hypothetical to the VE.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Born on February 18, 1960 (age 47 at the time of the ALJ's determination), Plaintiff is a "younger individual." *See* 20 C.F.R. §§404.1563, 416. 963. Plaintiff last completed the 11th grade and has past relevant work a lead man at a paper mill (Tr. 58, 63).

### B. Medical Evidence

In August 1999, Plaintiff sustained an injury at work when a weight fell from approximately 20-30 feet overhead and struck him on the left side of his head, neck and shoulder region (Tr. 139). Plaintiff went to the hospital after the injury, but his X-rays reportedly were normal and he returned to work the same day (Id.). Plaintiff claims to have experienced increased pain in his neck and shoulder over time (*See e.g.*, Id.). In July 2000, Plaintiff began experiencing numbness and weakness in both hands (Tr. 169). At this time, Plaintiff was

engaged full-time in employer-sponsored training to become an electrician apprentice, which required him to pull "miles of wire" for extended periods of time (Tr. 169-70).  In October 2000 and February 2001, Plaintiff underwent peripheral nerve studies, which confirmed the presence of bilateral carpal tunnel syndrome (Tr. 171).  In July 2001, Plaintiff had left and right carpal tunnel release surgery (137-38, 184).  Following the surgery, in September 2001, Plaintiff had "demonstrated a steady improvement and reduction of his symptoms and improvement in his strength and range of motion." (Id.).

In November 2001, Plaintiff visited a neurologist, Michael Leslie, M.D. (Tr. 127).  Based on a partial MRI of Plaintiff's cervical spine, Dr. Leslie's impression was that Plaintiff had cervical spondylosis, with continuing left upper extremity pain and weakness (Tr. 127-28).  Dr. Leslie thought Plaintiff's cervical spondylosis "may be influencing some of his symptoms" (Tr. 128).  However, Dr. Leslie also expressed concern that Plaintiff's "clinical symptoms seem to far outweigh the evidence noted on MRI imaging" (Id.).  Dr. Leslie recommended a formal orthopedic consultation, a neurological evaluation, and continued use of medication (Tr. 128-29).

In May 2002, Plaintiff underwent cervical decompression and fusion surgery for a cervical disc herniation resulting from his 1999 work-related injury (Tr. 114, 118).  At Plaintiff's six-month post-surgery exam in December 2002, the fusion appeared to be consolidating but was not yet solid (Tr. 117).  On exam, Plaintiff was neurologically intact with no noted deficits, and his strength was normal in the upper extremities (Tr. 117).  Plaintiff reported experiencing some rear shoulder pain but no radiating pain (Tr. 117).

3

The record does not reflect that Plaintiff had any further treatment during the period from December 2002 to May 2003, the date on which Plaintiff claims to have become totally disabled (Tr. 71-75, 57).  In June 2003, at a one-year follow-up exam for Plaintiff's neck surgery, the cervical  fusion had "completely" solidified, and Plaintiff complained of only "mild" but "tolerable" inner shoulder pain (Tr. 117).  At the same exam, however, Plaintiff complained of a great deal of lower back pain that was making it difficult for him to stand (Id.).  Based on his review of Plaintiff's MRI scan, Plaintiff's doctor concluded that Plaintiff had a "strong component of lumbar stenosis," and "degenerative changes plus disc protrusions over multiple levels contributing to his symptoms" (Id.).  Plaintiff's doctor indicated that he intended to keep Plaintiff "off-work." (Id.).

The record does not reflect that Plaintiff underwent any further treatment until August 2004, at which point Plaintiff began treatment at Cuyahoga Falls General Hospital Pain Management Center with James P. Bressi, D.O. (Tr. 203-04).  On August 3, 2004, after his first visit with Plaintiff, Dr. Bressi wrote a letter to Plaintiff's primary physician recommending pelvic joint injections with manipulation and lower back epidurals, explaining that "if we can get the sacroiliac joint freed up, get some medicine into his low back where the disk is [], I think that we can get him feeling better . . . " (Id.).

In a second letter of the same date to an unknown recipient, Dr. Bressi wrote, "I believe [Plaintiff] is totally and permanently disabled . . . " (Tr. 205).  Dr. Bressi further wrote, "[M]y only goal is to get his pain better controlled.  I am not looking for this gentleman to be able to go back to some remunerative activity, as I feel he will fail.  I do not feel that any type of [vocational rehabilitation] or any type of work conditioning will do anything to significantly

4

improve his functional level" (Id.).  Dr. Bressi concluded by writing that, "in [his] opinion [Plaintiff] deserves the disability,"  and that Plaintiff "is not going to improve over time, [but] will probably degenerate even more over time" (Tr. 206).

Plaintiff continued to see Dr. Bressi for pain management treatment from August 2004 to May 2007, the month of the ALJ hearing (Tr. 214).  As part of the treatment, Dr. Bressi prescribed Plaintiff pain medications and administered lumbar injections to him approximately four times per year (Tr. 217-57).  Plaintiff's reported pain at these visits ranged from unchanged to terrible to moderately well-controlled (See e.g. Tr. 221, 227, 255).

On August 2, 2004, Plaintiff saw Ronald Berkowitz, M.D., Chief Medical Consultant with the Bureau of Disability Determination, for a consultative examination (Tr. 184-86).  Upon exam, Dr. Berkowitz observed no abnormalities in shape or contour in either Plaintiff's cervical, lumbar and thoracic spines or in his upper and lower extremities (Tr. 185-86).  During gait examination, Plaintiff used no ambulatory aids and was able to heel and toe walk (Tr. 185-86).  With respect to Plaintiff's cervical spine and thoracolumbar spine, however, there was a significant decrease in range of motion in all directions and "diffuse tenderness" throughout the entire region (Tr. 185).  During the thoracolumbar spine examination, Plaintiff's straight leg test was negative, but Plaintiff indicated that he experienced a "significant amount of back pain" (Tr. 185).  Plaintiff's upper extremity exam indicated left hand and wrist weakness, but Dr. Berkowitz "questioned the reliability of this exam, as [Plaintiff's] weakness would come and go . . . " (Tr. 186).  Vascular aspects were normal in both the lower and upper extremities, with "good" pulses and "brisk capillary refill bilaterally" (Tr. 186).

Upon concluding the examination, Dr. Berkowitz offered the following assessment:

5

It is difficult for me to tell which of his symptoms are real and which are not. I do believe that there is a certain component to his condition that he is not being honest with us about. I feel that he is exaggerating his conditions . . .

However, I do feel that he is having some back and neck pain. I do not get any real evidence of a neurologic condition today, as there was minimal weakness, except for in his left upper extremity which I think may have been him being dishonest, as well as some decreased range of motion in his left shoulder. Reflexes were symmetric and there were no upper motor neuron symptoms.

With regard to sitting, walking, lifting, carrying, and handling objects he should have mild to moderate impairment based on my exam. However, the claimant feels that his condition is much worse and therefore within his reality he is going to have significant impairment with any sort of work" (Tr. 186-87).

In August 2004, state agency physician Myung Cho, M.D. completed an RFC Assessment. He opined, among other things, that Plaintiff could occasionally lift, push, pull and/or carry up to 20 pounds; could frequently lift, push, pull and/or carry up to 10 pounds; could stand and/or walk about six hours in a work day; could sit about 6 hours in a work day; could occasionally climb a ramp or stairs, balance, stoop and crouch, but could never climb ladders, ropes or scaffolds; and was limited in his ability to reach with his left arm in all directions (Tr. 207-11). In his findings, Dr. Cho explicitly noted the MRIs of Plaintiff's neck, left shoulder and lumbar spine and the negative results from the Tinel, Phalen, and straight leg raising exams (Tr. 208-09). In November 2004, state agency physician Nick Albert, M.D. affirmed Dr. Cho's RFC Assessment (Tr. 36, 211).

### E. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified that even after fusion surgery in his neck in 2003 he still had a lot of neck pain. He explained that the pain runs through the middle of his back, through his buttocks

and down a leg into his foot and heel (Tr. 290).  He also stated that he still has pain in his left shoulder and numbness in his hands, and that it is painful to lift his left arm (Tr. 290-91).

With regard to his activities, Plaintiff estimated that he could walk 30 yards before needing to take a break, and that he would have to use the cane Dr. Bressi prescribed for him (Tr. 292).  Plaintiff further estimated that he can stand for 10 or 15 minutes before needing to sit or lie down (Tr. 303).  Plaintiff stated that he drives very rarely - only to the store if he needs something badly, or to church, though he rarely attends (Tr. 294).  Though Plaintiff's wife participates primarily in the children's after-school activities, Plaintiff has tried to attend some activities and recently went to his daughter's National Honor Society banquet (Tr. 294-95).  Plaintiff indicated that he knows how to work with computers but rarely uses his computer at home (Tr. 295).  With regard to household chores, Plaintiff explained that he tries to "straighten up a little bit," tries to help with the dishes, does a little bit of laundry, and could probably lift five pounds, but he does not vacuum or do yard work or any maintenance on his car (Tr. 295-97).

Regarding his medications, Plaintiff testified that one of his medications "definitely helps" with his pain but also makes him feel tired and cranky (Tr. 300).  Plaintiff reported that another of his medications gives him headaches and makes him feel cranky and so tired that he sleeps hours during the day (Tr. 300-01).  A third medication, Tizanidine, allegedly "shuts down" his body - making his legs feel "real rubbery" so that he cannot walk (Tr. 302).  Plaintiff also acknowledged that the epidurals he receives from Dr. Bressi help alleviate his pain (Tr. 306).

## 2. Medical Expert Testimony

Medical expert and orthopedic surgeon Daniel Girzadas, M.D. testified that he believed Plaintiff was "stable [and] able to return to work" (Tr. 308).  More specifically, Dr. Girzadas opined that Plaintiff's impairments did not meet or equal a listing. According to Dr. Girzadas, Plaintiff's RFC allows him to lift 10 pounds occasionally; to stand or walk for six hours in an eight hour work day; to sit for six hours in an eight hour work day; to push and pull 10 pounds occasionally (Tr. 315).  However, Dr. Girzadas thought that Plaintiff could not do any foot control work, should never work on scaffolds, and should be limited to balancing, lunging and stooping only occasionally (Id.).  In addition, Dr. Girzadas opined that Plaintiff could reach above his shoulders and do hand and finger manipulations frequently, but that he should avoid unprotected heights, dangerous machinery and exposure to gases and other air toxins (Tr. 315-16).

In response to Plaintiff's attorney's question whether he thought Plaintiff's complaints were "out of proportion to the record," Dr. Girzadas stated, "[w]ell, yes" (Tr. 317).  Dr. Girzadas based his opinion on findings from the consultative examination and other examinations related to Plaintiff's carpal tunnel syndrome and cervical and lumbar spine (Id.).

Plaintiff's attorney also questioned Dr. Girzadas about the alleged side effects of Plaintiff's medications (Tr. 319-20).  Dr. Girzadas explained that Plaintiff was taking commonly prescribed medications, and that although it was possible for these medications to affect Plaintiff's ability to work, it was possible that a person taking these medications to sustain full-time employment (Tr. 320).

### 3. Vocational Expert Testimony

The ALJ asked Vocational Expert James Breen (the "VE") whether a hypothetical individual could return to his previous work as a lead mean at a paper mill if he were limited to standing/walking six hours per day, with the ability to reach and handle bilaterally frequently with his upper extremities; lifting, pushing and pulling a maximum of 10 pounds; no foot control operations; no climbing or crawling; no work at unprotected heights, around dangerous machines or open bodies of water; and no work with concentrated exposure to fumes, odors or other respiratory irritants (Tr. 321-22). The VE responded that such an individual could return to work as a lead foreman if the job remained as Plaintiff had performed it in the past, since the job did not require much lifting (Tr. 322).

The ALJ then asked the VE to consider whether such an individual could return to any other work in the regional or national economy, assuming that the lead man job required some lifting and Plaintiff could not return to that work (Id.). The VE responded that Plaintiff still could perform some sedentary jobs, such as information clerk, with about 630 positions available in the local area and 45,000 available in Ohio; eye glass assembler, with 450 jobs available locally and 40,000 in the state; and surveillance system monitor, with about 400 available in the local area and 7,500 available in the state (Tr. 323). Plaintiff's attorney asked the VE whether these jobs would remain available if a sit/stand option were added to Plaintiff's RFC (Tr. 324). The VE responded that the above listed jobs would remain available (Tr. 324).

However, when the ALJ asked the VE whether the above listed jobs or any others would be available to an individual who had difficulty staying on task an average of 15 minutes out of every hour, the VE replied in the negative (Tr. 323). The ALJ then asked the VE whether those

jobs or any others would be available to an individual who needed to lie down for at least an hour at irregular intervals during the work day (Tr. 323-24). The VE responded that no jobs would be available to such an individual (Tr. 324). Finally, the ALJ asked the VE whether any jobs would be available to an individual who needed to miss work at least twice per month due to pain (Id.). The VE replied that there would not (Id.).

In his examination of the VE, Plaintiff's attorney asked the VE whether any jobs would remain available to the hypothetical individual if he were not able to do "repetitive"-type work with his upper extremities (Tr 324-26). The VE responded that the job of surveillance system monitor likely would remain available (Tr. 326).

### III. DISABILITY STANDARD

A claimant is entitled to receive Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. §§ 404.1505, 416.905.

### IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S.

389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V. <u>ANALYSIS</u>

### A. **Whether the ALJ Properly Discounted Plaintiff's Credibility**

Plaintiff argues that the ALJ's adverse determination regarding his credibility is against the great weight of the evidence and that the ALJ failed to give adequate reasons to support his credibility finding. Specifically, Plaintiff claims that the ALJ erred when he found Plaintiff's allegations of severe, disabling pain to be inconsistent with the medical evidence, Plaintiff's testimony, and Plaintiff's daily activities. The Court is not persuaded by Plaintiff's arguments.

"[T]he determination of credibility related to subjective complaints of pain rests with the ALJ, and the ALJ's opportunity to observe the demeanor of the claimant . . . is invaluable and should not be discarded lightly." *Gaffney v. Bowen*, 825 F.2d 98, 101 (6th Cir. 1987) (citations omitted). Where there are discrepancies between a plaintiff's testimony and what the written record shows, a reviewing court should not substitute its findings for those of the ALJ. *Gooch v. Sec. of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir.1987). Moreover, "discounting [a claimant's] credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Bradley v. Secretary of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988)).

To find disabling pain in most disability benefits cases, there must be objective evidence of an underlying medical condition and either objective medical evidence *confirming* the severity of the alleged pain arising from that medical condition, or the objectively determined medical condition must be of a severity which can *reasonably be expected* to give rise to the alleged pain. *See Buxton v. Halter* 246 F.3d 762, 773 (6th Cir. 2001); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986).

However, the *Duncan* test is not the end of the analysis. The ALJ must consider other factors that may or may not corroborate Plaintiff's claims and point to evidence besides his own personal observations when rejecting a plaintiff's allegations of severe and disabling pain. *See Martin v. Sec. of Health and Human Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984); *Walters*, 127 F. 3d at 531; *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1986); and 20 C.F.R. § 416.929(c)(2). These factors may include: statements from the claimant and the claimant's treating and

examining physicians; diagnosis; efforts to work; the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky*, 35 F.3d at 1039-40; 20 C.F.R. § 416.929(a), (c)(3).

The ALJ in this case provided a relatively thorough credibility assessment and review of Plaintiff's allegations, as required under *Duncan* and the Social Security Regulations.  After reviewing the record as a whole, the ALJ determined that Plaintiff's impairments reasonably could be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible (Tr. 20). In making his determination, the ALJ considered the appropriate factors set forth in 20 C.F.R. § 929(c)(3), including Plaintiff's daily activities, symptoms, medication taken to alleviate symptoms, treatment other than medication taken to alleviate symptoms, and evidence of Plaintiff's functional limitations due to his symptoms.  (Id.).

Specifically, the ALJ found Plaintiff's ability to drive and engage in his activities of daily living to be inconsistent with his allegations of severe disabling pain (Id.).  The ALJ noted Plaintiff's cervical disc herniation with subsequent decompression and fusion surgery and that on follow-up examination, Plaintiff "was neurologically intact with no deficits, normal strength in the upper extremities and no motor deficits or reflex changes."  The ALJ also pointed to the MRI scan of Plaintiff's lumbar spine, which showed only mild degenerative changes.  (Id.).  He noted that although Plaintiff complained of low back pain at the Pain Management Center,

Plaintiff "admitted that medications [were] helpful and [were] causing less fatigue than his previous regimen."  (Id.).  He also noted Plaintiff's admissions that his injections were very helpful and that his activity level and overall quality of life had improved since starting the injection regimen (Id.).  Based on the above, the Court concludes that the ALJ considered the appropriate evidence in making his credibility determination and gave adequate reasons for finding Plaintiff to be less than fully credible.

In addition, substantial evidence supports the ALJ's determination as to Plaintiff's credibility.  While the record contains some evidence supporting Plaintiff's claims of debilitating pain, much of the evidence weighs against Plaintiff's assertions.  For instance, Dr. Bressi wrote in his "Letter of Disability" of August 3, 2004 that Plaintiff "has terrible pain in the back and neck," that "[h]is pain is not controlled at the present time," that "he will probably degenerate even more over time" and that in his opinion, Plaintiff "is completely and permanently disabled" (Tr. 205-06). But according to later notes from the Pain Management Center where Plaintiff continued to see Dr. Bressi until 2007, Plaintiff's reported pain ranged from unchanged to terrible to moderately well-controlled (Tr. 221, 227, 255).  Dr. Berkowitz wrote on behalf of Dr. Cantor with the Bureau of Disability Determination that although he felt Plaintiff "is having some back and neck pain," he could not tell which of Plaintiff's symptoms were real and which were not (Tr. 186-87).  He felt that Plaintiff was exaggerating his symptoms (Tr. 186).  Dr. Leslie likewise wrote that Plaintiff's "clinical symptoms seem to far outweigh the evidence noted on MRI imaging" (Tr. 128).  In light of Plaintiff's allegations of severe, disabling pain, the Court also finds it somewhat curious that Plaintiff has refused to undergo a full MRI, despite medical evidence that a full MRI is the best way to ascertain the extent of Plaintiff's medical

problems (Tr. 115, 125-26, 143).  Plaintiff claims that he is unable to withstand a full MRI due to claustrophobia; however, the Court imagines that someone with *debilitating* pain - claustrophobia or no - likely would be a little more willing to get to the root of his medical problems.  Based on the above, the Court finds that the ALJ did not err in making his credibility determination.

**B.  Whether the ALJ Properly Considered the Side Effects of Plaintiff's Medications**

Plaintiff claims that the ALJ improperly failed to consider the side effects of Plaintiff's medications, despite the requirement under Social Security Ruling No. 96-7p that the ALJ consider "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms."  Plaintiff further claims that the ALJ failed to credit the VE's answers to hypotheticals that included limitations for the side effects of Plaintiff's medications.

Plaintiff's characterization of Social Security Ruling No. 96-7p is somewhat incomplete. Social Security Ruling No. 96-7p provides that the ALJ must follow a two-step process in considering a claimant's symptoms.  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to cause the claimant's alleged symptoms.  S.S.R. No. 96-7p.  Second, once the ALJ has determined the existence of such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *Id.*  When evaluating the credibility of a claimant's statements regarding his symptoms as part of this second prong, the ALJ must consider various factors including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the symptoms; (3) precipitating

and aggravating factors; (4) *the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms*; (5) treatment, other than medication, the claimant receives to relieve pain; (6) measures used by the claimant to relieve symptoms; (7) and any other factors concerning functional limitations due to symptoms. *Id.*  Therefore, while it is true under Social Security Ruling No. 96-7p that the ALJ must consider "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms," that requirement is part of a larger inquiry regarding a claimant's credibility.

In this case, the ALJ explicitly stated in his ruling that he must consider the side effects of Plaintiff's medications in making his credibility determination (Tr. 20).  He also wrote specifically about the effectiveness of Plaintiff's medications and treatment:

> [t]he follow-up treatment notes from the Pain Management Center show that although [Plaintiff] complains of low back pain, he admitted that medications are helpful and was (sic) causing less fatigue than his previous regimen.  The claimant was also getting injections that were very helpful

(Id.).  Although the ALJ did not write specifically about the *side effects* of Plaintiff's medications, it is well-settled that:

> [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-08 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).  As discussed in Part A., *supra*, the ALJ reasonably discounted Plaintiff's credibility as whole.  Although the ALJ did not specifically mention all of Plaintiff's allegations, it is reasonable to assume that the ALJ's credibility determination took them into account, including those regarding the side effects of his

16

medications. Therefore, the court finds that the ALJ properly considered the side effects of Plaintiff's medications pursuant to Social Security Ruling No. 96-7p.

Plaintiff also claims that the ALJ failed to credit VE testimony that took into account the side effects of Plaintiff's medications. When the ALJ included in his hypothetical to the VE a limitation of having difficulty concentrating and being off-task for approximately fifteen minutes every hour, the VE responded that no jobs would be available to the hypothetical claimant (Tr. 323). The VE responded to subsequent questions from the ALJ that no jobs would be available to a hypothetical claimant who either had to lie down for an hour at irregular intervals during the work day or miss two days of work per month (Tr. 323-24). Plaintiff claims that each of these hypothetical limitations accurately describes Plaintiff, and since any one of them would render him disabled, this case should be reversed with an award of benefits issued.

However, Plaintiff points to no medical records or other objective evidence indicating that Plaintiff is off-task fifteen minutes every hour, that he has to lie down at irregular intervals during the day, or that he would have to miss two days per month should he return to work. Plaintiff argues that he has complained "throughout the record" about the side effects of his medications (Doc. 14, at 3). Yet most of the evidence Plaintiff cites for this proposition comes from either his own hearing testimony or his application for disability benefits (*See* (Id.) (citing Tr. 88, 94, 106, 301-02)). Plaintiff's medical records do reflect that Plaintiff's "speech is slurred at times because of medications," that his medications have caused him "some nausea," and that Plaintiff had to stop using Amitripiline because it made him "too tired" (Tr. 150-51, 159). But none of this evidence definitively demonstrates that the limitations listed above accurately describe Plaintiff. Rather, each of these limitations was based primarily upon Plaintiff's own

assertions, and as explained above, the ALJ accurately addressed and discounted Plaintiff's credibility as a whole.  Since Plaintiff has not met his burden with regard to whether the above limitations accurately describe him, the Court finds that the ALJ properly discounted the limitations in making his disability determination.

### C.  The ALJ's Treatment of Plaintiff's "Treating Physician," Dr. Bressi

### 1. Whether the ALJ Properly Discounted Dr. Bressi's Opinion

Plaintiff claims that the ALJ erred by failing to give significant or controlling weight to Plaintiff's treating physician, Dr. Bressi.  Plaintiff argues that Dr. Bressi was Plaintiff's treating physician for multiple years prior to the hearing and that, under Sixth Circuit law, the opinions of a treating physician are entitled to great weight and generally must receive greater weight than the opinions of a consulting physician who has examined the claimant on a single occasion.

If a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," it should receive controlling weight.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001). This is known as the "treating physician doctrine."  However, if the treating physician's conclusions are based, in large part, on Plaintiff's subjective complaints of pain, an ALJ's decision to disregard the doctor's opinion is proper.  *See Young v. Secretary of Health & Human Servs.* 925 F.2d 146, 151 (6th Cir. 1990).  Moreover, the opinion of a physician who examined Plaintiff only once is not entitled to considerable weight.  *See* 20 C.F.R. § 416.927(d)(2)(i).  A statement by a physician whether a claimant is disabled or unable to work is not controlling.  *See Id.* at § 416.927(e)(1).  Indeed, because a claimant's employability, *i.e.*, whether he is disabled, is an issue ultimately reserved to the Commissioner, a physician's

18

opinion on this topic was not entitled to any special significance.  *See Walters*, 127 F.3d at 530-31; *see also* 20 C.F.R. §§ 404.1527(e)(1)-(3).

The Court is not convinced that Dr. Bressi's opinion of August 3, 2004 merits significant or controlling weight. When Dr. Bressi came to his conclusion that Plaintiff is "totally and permanently disabled," he was "seeing him for the first time today" (Tr. 205).  Most of Plaintiff's medical records were in another physician's office at that time (Id.).  Additionally, many of the apparent reasons behind Dr. Bressi's determination as he articulates them in the letter depend upon Plaintiff's sincerity and memory for their reliability.  For instance, Dr. Bressi writes that Plaintiff's "left arm is very weak and numb, and his left leg is also weak.  He has terrible pain in his back and neck.  He cannot sit for any reasonable length of time" (Id.).  Later, Dr. Bressi writes,

> [t]his gentleman had an excellent work record as a laborer and he loved doing his job, he wanted to go back to his job.  He is, at the present time, suffering greatly. He does not sleep well, he gets very irritable . . . .  He recently went through an independent medical exam and this was excruciating to him.  He stated the doctor kept pushing on his neck trying to evoke some pain signals, and he asked him to quit, and for the next three days after that, he states he was in terrible pain and he could hardly get out of bed, which is understandable

(Id.).  It is fairly clear from the subjective nature of these assertions that Dr. Bressi must have based them, at least in part, on assertions or conduct coming from Plaintiff himself.  Thus, their accuracy depends upon Plaintiff's accuracy, and the Court finds there was substantial evidence under these circumstances for the ALJ to discount Dr. Bressi's opinion.

## 2.  Whether the ALJ Gave "Good Reasons" for Discounting Dr. Bressi's Opinion

Plaintiff also claims that the ALJ failed to articulate a reason for rejecting Dr. Bressi's opinion.  According to Plaintiff, the Sixth Circuit has held that an ALJ must articulate a reason

for rejecting the opinion of a treating physician; but here, the ALJ merely adopted the opinion of the testifying medical expert without further explanation.

Plaintiff is correct in his assertion that if an ALJ rejects the opinion of a treating physician, he must articulate clearly his reasons for doing so. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Specifically, if a treating source is not accorded controlling weight, the ALJ must apply the following factors in determining what weight to assign the opinion - the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. 20 C.F.R. § 404.1527(d). In *Wilson*, the ALJ's failure to give "good reasons" for discounting a treating physician's opinion regarding a plaintiff's ability to work was grounds for reversal. *Wilson*, 378 F.3d at 544. The Commissioner in that case argued that the ALJ's failure to give good reasons for rejecting the opinion of plaintiff's treating physician constituted harmless error because the there was substantial evidence in the record for discounting his opinion. *Id.* at 546. However, the Court stated that:

> [a] court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely . . . . To hold otherwise and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2) would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory.

*Id.*

In this case, the extent of the ALJ's reasoning for adopting the Dr. Girzadas' - and implicitly rejecting Dr. Bressi's - opinion is as follows:

> [a]s for the opinion evidence, I give considerably more weight to the opinion of Dr. Daniel Girzadas, an independent medical expert who testified at the disability hearing and whose opinion is generally consistent with the residual functional capacity I have assessed herein. I have also considered [Plaintiff's] treating source opinion in Exhibit 5F/4 and the State agency opinion in Exhibit 7F

(Tr. 21).

Notably, the word "treating" in this paragraph is crossed out, and something else - presumably "examining" - is written underneath. Also worth noting is that the Exhibit number here indicated for Plaintiff's "treating" - or "examining" - source does not correspond with the Exhibit number of Dr. Bressi's opinion, which is Exhibit 6F/12-15, but instead with the Exhibit number of Dr. Berkowitz's report on behalf of the Bureau of Disability Determination. Therefore, nothing in this paragraph indicates whether the ALJ considered Dr. Bressi's opinion, or if he did, what weight he gave to that opinion, or how he reached his determination. The ALJ neither mentions Dr. Bressi's name in this paragraph nor explicitly indicates whose opinions Dr. Girzadas' opinion trumps. Thus, it can hardly be said that the ALJ strictly complied with the procedural requirement of giving good reasons for discounting the opinion of a treating source. Under *Wilson*, failure to comply with this requirement is reversible error.

### 3. Whether Dr. Bressi was a Treating Physician When he Gave his Opinion

However - and although the parties do not address the issue specifically - the court does not think that Dr. Bressi was a "treating physician" within the meaning of the Social Security Regulations and Sixth Circuit law when he gave his opinion. 20 C.F.R. § 404.1502 provides that a treating physician is "your own physician . . . who provides you, or has provided you with

medical treatment or evaluation and who has, or has had, an *ongoing treating relationship with you*." (Emphasis added).  As Defendant notes, "Dr. Bressi had barely established a treating relationship with [Plaintiff] at the time he wrote the August 2004 letter" (Doc. 13, at 14).  In fact, he was "seeing him for the first time today" (Id.).  Thus, when Dr. Bressi gave his opinion regarding Plaintiff's condition, he had examined Plaintiff *only once*.  This fact suggests that the "treating physician doctrine" should not apply in this case.

In *Kornecky*, 167 Fed.Appx. at 506-07, the Court concluded that a physician who had examined the plaintiff only once was not a "treating physician," and accordingly, that his opinion was not entitled to presumptive weight.  In that case, the plaintiff claimed that Dr. Lian was her treating physician, despite the fact that Dr. Lian had conducted only one examination of the plaintiff at the time he rendered his opinion regarding the plaintiff's RFC.  *Id.* at 506.  The plaintiff argued that Dr. Lian's single exam qualified him as a treating physician because it occurred only a few weeks prior to the time for the ALJ's decision - a time too early to tell whether Dr. Lian would at some point become the plaintiff's treating physician.  *Id.*  The Court stated, however, that the relevant question is not whether Dr. Lian might have become a treating source, but rather "whether Lian had the ongoing relationship with Kornecky to qualify as a treating physician *at the time he rendered his opinion*."  *Id.*  (Emphasis in original).  The Court held that, given the nature and prolonged course of the plaintiff's medical difficulties, a single examination did not suffice to render Lian a treating physician.  *Id.*

The *Kornecky* plaintiff further argued based on *Wilson* that the ALJ committed reversible error by failing to articulate his reasons for rejecting Dr. Lian's opinion.  *Id.* at 507.  However, the Court held that because Dr. Lian was not a treating physician, the procedural safeguard of

giving "good reasons" at issue in Wilson did not apply.  *Id.*  Since Dr. Lian was merely an examining physician, and because an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party," the Court found no reason to remand the case simply for the ALJ to discuss specifically the problems with Dr. Lian's opinion.  *Id.* at 507-08.

Based on the length of Plaintiff's medical history in this case, his numerous visits with several different doctors even as of the time he first visited Dr. Bressi and, most importantly, the fact that Dr. Bressi had examined Plaintiff only once when he gave his opinion, the Court finds that Dr. Bressi was not Plaintiff's "treating physician" at the time he formulated his opinion.

Plaintiff in this case argues that Dr. Bressi's original opinion nevertheless should get significant weight because Dr. Bressi never reached a contrary opinion during the three years he treated Plaintiff.  The Court does not find this argument particularly persuasive.  Admittedly, this case is somewhat different from *Kornecky* in that Plaintiff did continue to see Dr. Bressi for several years after his initial visit in August 2004, whereas the plaintiff in *Kornecky* saw Dr. Lian once in total.  However, the Court in *Kornecky* stated, "Kornecky points to nothing that prevented her from visiting Lian regularly after their one visit, which might have rendered Lian a treating source before the ALJ's decision. Then, Kornecky could have asked the ALJ to *supplement the record with an opinion from Lian that was based on those subsequent visits*."  *Id.* at 506.  (Emphasis added).  Without such affirmative proof, the plaintiff's alleged subsequent visits to Dr. Lian could not *retroactively* render Dr. Lian a treating physician at the time he gave his RFC assessment.  *Id.*  Indeed, Plaintiff in this case readily could have asked Dr. Bressi to supplement his original opinion at some later time, and the Court finds it somewhat curious that

he apparently did not do so in the three subsequent years of his treatment.  In the absence of affirmative evidence that Dr. Bressi's opinion remained exactly the same over the three years of Plaintiff's treatment, the Court judges Dr. Bressi's determination under the original circumstances it was made.  Thus, the Court finds that Dr. Bressi was not a treating physician when he gave his opinion, and therefore the procedural safeguard of "good reasons" does not apply.

### D.   Whether the Jobs Available to Plaintiff Exist in Substantial Numbers in the National Economy

Plaintiff next argues that the jobs available to Plaintiff based on the VE's testimony do not exist in substantial numbers in the national economy.

Work which exists in significant numbers in the "national economy" means work which exists in significant numbers *either* in the region where such individual lives or in several regions of the country. 20 C.F.R. §§ 404.1566 and 416.966.  (Emphasis added).  It does not matter whether the work exists in the local area in which the claimant lives. *Id.* at § 416.966(a)(1).  There is no bright line test for determining whether work exists in significant numbers in the national economy; each determination must be made on a case by case basis. *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988).  In *Hall*, the Court found 1,380 jobs in the plaintiff's local area to be a substantial number. *See id.* at 275.  In *Stewart v. Sullivan*, 904 F.2d 708 (6th Cir. 1990), the Court held that as few as 125 jobs in the local area constituted a significant number of jobs.   In *Cummings v. Massanari*, No. 99-3110, 2001 U.S. Dist. LEXIS 25979 (N.D. Ohio 2001), the Court held that 400 local surveillance system monitor positions constituted a significant number of jobs.

In this case, the ALJ relied on VE testimony to conclude that Plaintiff could perform either his past relevant work as a lead man at a paper mill or work as an information clerk, a surveillance system monitor, or an eye glass assembler (Tr. 21-22).  According to the VE, there are 45,000 information clerk jobs in the state of Ohio, with 630 jobs in Plaintiff's local area; 40,000 eye glass assembler jobs in the state with 450 in the local area; and 7,500 surveillance system monitor jobs in the state, with 400 in the local area (Tr. 322-23).  In support of Plaintiff's claim that these numbers are not significant, Plaintiff argues that *Graves v. Sec. of Health*, 473 F.2d 807 (6th Cir. 1973) held that 750 jobs in the area is not a substantial number.  Plaintiff claims that under *Graves* numbers of 630, 450 and 400 cannot be substantial.  But *Hall* - which held that 1,380 jobs was a substantial number - explained that "[t]he outcome in *Graves* was determined by the failure of the vocational expert to testify without qualification that jobs which the plaintiff could perform actually existed in the economy," not by the job numbers themselves. *Hall*, 837 F.2d at 274.  Under *Hall*, *Stewart*, and *Cummings*, *supra*, a combined number of 1480 local jobs most likely is a significant number; certainly, the combined statewide number of 92,500 jobs also qualifies as substantial.  However, the Court does not decide whether a significant number of jobs are available to Plaintiff because, as discussed below, there is insufficient evidence in the record to show which jobs would remain available to Plaintiff had the ALJ included a limitation for Plaintiff's carpal tunnel in his hypothetical to the VE.

### E.  Plaintiff's Carpal Tunnel Syndrome

#### 1.  Whether the ALJ Erred in Failing to Include a Limitation for Plaintiff's Carpal Tunnel Syndrome in his Hypothetical to the VE

Plaintiff argues that the ALJ erred by failing to include a limitation for Plaintiff's carpal tunnel syndrome in his hypotheticals to the VE.  Plaintiff claims that such failure was error

25

because, although the ALJ found Plaintiff's condition to be severe, the ALJ relied upon VE testimony that did not include a limitation for carpal tunnel syndrome in formulating Plaintiff's RFC.

Under *Varley v. Sec. of Health and Hum. Serv.*, 820 F.2d 777, 779 (6th Cir. 1987), "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, *but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments*.'" (Emphasis added).  Should the hypothetical fail to accurately describe a claimant's physical and mental impairments, the defect is fatal to both the vocational expert's testimony and the ALJ's reliance upon that testimony.  *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002).

In this case, the ALJ essentially adopted as Plaintiff's RFC the first hypothetical he posed to the VE. That hypothetical described an individual limited to light exertion duties (standing/walking 6 hours a day); lifting, pushing and/or pulling 10 pounds maximum, 10 pounds repetitively; no operation of foot controls; no climbing or crawling; no work at unprotected heights, around dangerous machinery, open bodies of water; no concentrated exposure to fumes or respiratory irritants; but able to handle and manipulate frequently with both upper extremities (Tr. 321-22).  According to the VE, such an individual would be able to return to his past relevant work as a lead man at a paper mill (Tr. 322), or if unable to do that, the individual could perform work as an information clerk, an eye glass assembler, or surveillance system monitor (Tr. 322-23).  Based on this testimony, the ALJ determined that the Plaintiff could either return to his past relevant work as a lead man or perform any of the above listed jobs.

Plaintiff's carpal tunnel syndrome is well-established in the record (*See e.g.*, Tr. 136, 141, 172). Yet neither this hypothetical, nor any of the ALJ's others, included a limitation related to that condition. Therefore, the ALJ's hypothetical did not accurately portray Plaintiff's physical impairments and neither it, nor the VE's response, can serve as substantial evidence to support the Commissioner's adverse determination.

The Commissioner argues that any such error on the part of the ALJ was harmless. According to the Commissioner, several of the jobs the VE listed - namely, surveillance system monitor, information clerk, and potentially Plaintiff's past relevant work as lead man - do not require significant hand or finger manipulation. Therefore, at least one if not all of these jobs would have remained available to Plaintiff even if the ALJ had included a carpal tunnel limitation in his hypothetical. The Commissioner further argues based on the VE's testimony that each of the above listed jobs exists in substantial numbers in the national economy; as a result, the disability determination would not be different on remand because work existing in substantial numbers in the national economy nevertheless would be available to Plaintiff.

The record is unclear as to what degree of hand and finger manipulation each of the jobs listed above specifically involves. In describing his job as lead man at the administrative hearing, Plaintiff testified that he would "[r]un a computer a lot," but he did not testify specifically regarding how much he used his hands (Tr. 279-82). The VE testified that a hypothetical claimant unable to perform work involving "repetitive" use of the upper extremities still could perform work as a surveillance system monitor because the job consists simply of "watching monitors;" however, the VE did not testify in greater depth about the job's specifics

27

(Tr. 326).  There is little, if any, evidence in the record regarding the duties of information clerk and eye glass assembler (*See* Tr. 321-27).

Although the Court finds it possible - even probable - that at least one of the above listed jobs would have remained available to Plaintiff had the ALJ had included a carpal tunnel limitation in his hypothetical to the VE, the Court cannot say so with total confidence.  The record is simply too underdeveloped as to the duties of each of the above jobs.  The Court notes in making its determination that the harmless error rule is not binding law in the Sixth Circuit in the Social Security context, and that a court applying the doctrine should do so with caution.  *Petchatsko v. Comm'r of Soc. Sec.*, 369 F.Supp.2d 909, 914 (N.D. Ohio 2004).  In this case, where applying the doctrine forces the Court to speculate about which jobs involve what levels of hand manipulation, and which jobs would or would not have remained available to Plaintiff had the ALJ's hypothetical included a carpal tunnel limitation, the Court finds it cannot fairly apply the doctrine.  Because the ALJ relied upon VE testimony that did not take into account all of Plaintiff's impairments, and because the Court cannot be certain that the outcome on remand would be exactly the same were the ALJ to include a carpal tunnel limitation, the Court finds that the ALJ's decision as to Plaintiff's disability is not supported by substantial evidence.

### 2.  Whether Plaintiff's Due Process Rights Were Violated

Plaintiff further argues in his reply brief that his due process rights were violated because Plaintiff's counsel did not have the opportunity to cross examine the VE about manipulative restrictions at the hearing.

The Court finds Plaintiff's due process claim meritless. "Although due process requires that a claimant be given the opportunity to cross-examine individuals who testify, that right is

28

waived if the attorney is silent when the opportunity to cross-examine arises." *Butler v. Comm'r of Soc. Sec.*, 1997 WL 259374 at *4 (6th Cir. 1997).  In this case, Plaintiff's counsel never even attempted to question the VE regarding manipulative restrictions at the hearing.  Plaintiff raises the issue for the first time now.  Therefore, the Court finds that Plaintiff has waived his due process claim.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner that Plaintiff was not disabled is not supported by substantial evidence.  Accordingly, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

s/ Kenneth S. McHargh

Kenneth S. McHargh

United States Magistrate Judge

Date:  September 22, 2008

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).